## Use of United States National Bank *v.* Penrod et al., Appellants.

Argued March 26, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Morton Meyers*, with him *Graham, Yost, Meyers & Graham* and *Budd B. Boose,* for appellants.

Clarence L. *Shaver,* with him *Harry Doerr* and *Shaver & Heckman,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, May 27, 1946:

May a judgment creditor of a husband attach, in execution, the joint bank account of a husband and wife held as tenants by the entireties? The court below decided that the attachments were valid on averments that the fund was created in violation of the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, 39 PS, section 351 et seq. From the court's refusal to grant defendant's motion for judgment n. o. v. this appeal was taken.

The facts are not in dispute. On and before October 1943 the husband was insolvent. Since 1933 he had been indebted to the plaintiff bank upon notes aggregating over $32,000. The wife never has possessed an individual estate. On October 29, 1943, the husband and wife (hereinafter called the Penrods) entered into an option agreement with the owner of 140 acres of land, with buildings, livestock, equipment and all coal mining rights and equipment, for $15,000 in cash. The agreement was signed and sealed by the owners and the Penrods. No cash consideration was paid upon the giving of the option, which under its terms expired on November 15, 1943, a period of 17 days. The land had been used by the owners for farming and coal stripping operations.

The Penrods, without funds, evolved a unique method to secure a home for themselves, and to enable them to pay the $15,000 purchase price out of profits from coal stripping operations. They induced two men named Minno and Willett to purchase the land and equipment and pay the owners $15,000 in cash in accordance with the terms of the option. On November 16, 1943, a deed from the owners of the land was executed and delivered conveying title to Dorothy Riddle, nominee of Minno and Willett. A written agreement was entered into on

December 16, 1943, between Minno and Willett and the Penrods, whereby Penrods were to be permitted to occupy the land and use the farm equipment; that the coal underlying the surface should be mined and Minno and Willett should receive 70 percent of the net profits from the sale of the coal and the Penrods should "have credited to their account" the remaining 30 percent of such profits; that the Penrods' share should be held in escrow and applied to the purchase price of $15,000; that upon the accumulation of profits due the Penrods to the amount of $15,000, a deed in fee should be given to the Penrods (excepting coal rights not herein involved). Provision was made that if on June 1, 1944, the Penrods' share of the profits should not equal $15,000, the Penrods would be entitled to pay the difference between such accumulated share and the contract price of $15,000, whereupon a deed would be given them. The contract was consummated. The Penrods went into possession and farmed the land. Minno and Willett entered into a contract with a coal stripping corporation, and coal was mined and sold; the profits were allocated in accordance with the agreement. By June 1, 1944, the Penrods' share of the profits did not amount to $15,000. Minno and Willett took full possession of the land. The Penrods removed therefrom; the livestock and farm equipment were sold at public auction. The Penrods were credited with $7,500 (concerning which there is no dispute). They thereafter contacted Joseph Calafiore, who agreed to, and did, advance $7,500 on a first mortgage. With the credit of $7,500 and the mortgage money of $7,500, the full consideration of $15,000 was repaid to Minno and Willett, who thereupon, on August 16, 1944, caused a deed to be made and executed from their nominee to "I. E. Penrod and Margaret H. Penrod, his wife." The Penrods then took possession (but did not live on the land), made contracts for mining and selling the coal, and deposited, in their joint names, in the garnishee bank, moneys from such coal operations, which are the

subject of this litigation. The husband's judgment creditor attached the funds in the joint account of the husband and wife, so held as tenants by the entireties.

Under these facts the learned court below decided that the transaction violated the Uniform Fraudulent Conveyance Act of 1921, supra. Section 4 of that act provides that "every conveyance made . . . by a person who is . . . insolvent, is fraudulent as to creditors . . . . if the conveyance is made . . . . without a fair consideration."

But it is to be observed that at no time did the husband ever directly or indirectly convey or transfer any of his own funds to his wife or to the joint ownership of himself and his wife. Indeed, neither the husband nor the wife possessed any funds and were even required to borrow money for sustenance and for moving. They secured an option on the land jointly without payment of any consideration; jointly they entered into an agreement to finance the purchase on borrowed money; the land was paid for partly out of the profits from the coal moving operation and partly from their joint purchase money mortgage; such a scheme, while perhaps unusual, contains no element of fraud or illegality; the bank account, which has been attached, was opened in their joint names as husband and wife and in which was placed their joint funds; the funds therein belonged to the husband and wife as tenants by the entireties.

This is an entirely different situation than where an insolvent husband purchases property *with his own money* and places title thereto either in his wife's name, or in the name of himself and wife as tenants by the entireties: *Bank of Pittsburgh v. Purcell*, 286 Pa. 114, 133 A. 31; *Iscovitz v. Filderman*, 334 Pa. 585, 6 A. 2d 270; *Commonwealth Trust Company v. Cirigliano*, 352 Pa. 108, 41 A. 2d 863.

As the transaction, from its inception, was a joint enterprise between the husband and wife, the creditors of the insolvent husband have no present interest in such

an estate by the entireties. Should the wife survive the husband she will become the absolute owner of the land, in which the husband's creditors will have no interest. On the other hand, if the husband survives the wife, he will become the owner of the land by survivorship, and the land will be subject to all his debts as any other property or estate of his would be. Such an estate is one by the entirety and is derived from the common law. The common-law rule, still in force in this Commonwealth, is that property—real or personal—conveyed to or held by a husband and wife during coverture is an estate by the entirety and not a joint tenancy or tenancy in common: *Gasner v. Pierce*, 286 Pa. 529, 134 A. 494; *Madden v. Gosztonyi Savings and Trust Company*, 331 Pa. 476, 200 A. 624; *In re Vandergrift's Estate*, 105 Pa. Superior Ct. 293, 161 A. 898; *Wakefield v. Wakefield*, 149 Pa. Superior Ct. 9, 25 A. 2d 841. We have recently defined and reviewed the quality of such an estate: *Gallagher Estate*, 352 Pa. 476, 43 A. 2d 132. Each spouse is seized of the whole or the entirety and not of a share moiety or divisible part.

The judgment is reversed and is here entered for the defendants.